IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **ALISSA H. DEL REAL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Civil No.** 14-cv-277-CJP[1] |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social** ) | |
| **Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Alissa H. Del Real is before the Court, represented by counsel, seeking judicial review of the final agency decision denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423

## Procedural History

Plaintiff initially applied for benefits in May 2009, alleging disability beginning on December 31, 2008. (Tr. 15, 100). The claim proceeded to a hearing before ALJ Paula Garrety, who issued an unfavorable decision on July 2, 2010. (Tr. 102-115). Plaintiff filed a new application in May 2011, alleging disability beginning on the same date. (Tr. 116). A decision on the 2011 application resulted in a favorable determination that plaintiff was disabled as of July 30,

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 9.

2010. (Tr. 200-02). The Appeals Council granted plaintiff's request for review of ALJ Garrety's initial unfavorable determination and remanded plaintiff's case for consideration of both claims due to the inconsistent findings of the ALJs. (Tr. 211).

Plaintiff's second hearing was held before ALJ Anne Pritchett in September 2012. (Tr. 41). ALJ Pritchett denied the application for benefits in a decision dated November 26, 2012. (Tr. 30).The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred in weighing the medical opinions.

2. The ALJ erred in plaintiff's credibility determination.

3. The ALJ failed to ask appropriate hypothetical questions to the vocational expert.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.  As is relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Most citations herein are to the DIB regulations out of convenience.

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, **649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is

presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. §§ 404.1520;** *Simila v. Astrue***, 573 F.3d 503, 512-513 (7th Cir. 2009);** *Schroeter v. Sullivan***, 977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler***, 737 F.2d 714, 715 (7th Cir. 1984).** See also, *Zurawski v. Halter***, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.  Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  See**, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir. 1995)**).

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, **402 U.S. 389, 401 (1971).**  In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, **103 F.3d 1384, 1390 (7th Cir. 1997)**.  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, *Parker v. Astrue*, **597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Pritchett followed the five-step analytical framework described above. She determined plaintiff had not been engaged in substantial gainful activity since the date of her application. (Tr. 17). She found plaintiff had severe impairments of major depressive disorder, bipolar disorder, anxiety disorder, degenerative disc disease of the cervical spine, and degenerative disc disease of the lumbar

spine. (Tr. 18). The ALJ determined these impairments do not meet or equal a listed impairment.

The ALJ found plaintiff had the residual functional capacity to perform work at the light level, with physical and mental limitations. (Tr. 21). Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past work. However, she was not disabled because she was able to do other work that exists in significant numbers in the regional and national economies. (Tr. 29-30).

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this opinion. The following summary of the record is directed to the points raised by plaintiff, which focus only on limitations arising from her mental condition. Therefore, the Court will omit substantial discussion of evidence related only to her physical conditions.

**1. Agency Forms**

Plaintiff was born on July 8, 1967. (Tr. 310). She was insured for DIB through December 31, 2014.[3] (Tr. 351). Plaintiff was five feet four inches tall and weighed one hundred and twenty-nine pounds. (Tr. 301).

According to plaintiff, her bipolar disorder, post-traumatic stress disorder, depression, and anxiety limited her ability to work. (Tr. 302). She completed high school as well as four years of college. (Tr. 307). Plaintiff previously worked as an

---

[3] The date last insured is relevant to the claim for DIB, but not the claim for SSI.  See, 42 U.S.C. §§ 423(c) & 1382(a).

accounting clerk and a bookkeeper. (Tr. 302-03). She took several prescription medications and as of May, 2012, she was taking Depakote as a mood stabilizer, Remeron, Pristiq, and Xanax for depression and anxiety, Fioricet for migraines, Hydrocodone, Norflex, and Tramadol for pain, Zofran for nausea, and Fluticasone for allergies. (Tr. 434).

Plaintiff submitted Function Reports in August 2009 and June 2011. (Tr. 316-22, 390-95). She reported that her ability to perform daily tasks was dependent upon whether she was having a good or bad day. (Tr. 316, 390). On good days she was able to do laundry or take a walk. However, she reported having one to three bad days a week where was unable to even get dressed in the morning. (Tr. 317, 390). She wrote herself notes to remember to shower or take her medicine. On plaintiff's good days, she would prepare simple meals. On her bad days she may not be able to eat at all. Plaintiff stated she spent maybe one hour a week on cleaning and laundry. (Tr. 318, 392). She was able to drive and she shopped for her own groceries. She handled financial matters but occasionally paid bills late or overdrew from her account. (Tr. 319).

Plaintiff had anxiety around people and would sometimes become withdrawn. She reported having difficulties remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others.  She typically could only pay attention for a half an hour and had trouble with detailed or long instructions. (Tr. 321).

**2. Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing on September 5, 2012. (Tr. 41). She was forty-five years old and had a bachelor's degree in business and accounting. (Tr. 42). She testified that she had been unable to work since December 2008 due to her panic attacks and inability to function on bad days. (Tr. 49). She attempted to return to work as a bookkeeper for one week but due to anxiety attacks she could not continue. (Tr. 45). She also began training at a Cracker Barrel but quit due to anxiety attacks. (Tr. 46).

Plaintiff received long-term disability benefits for about a year but at the time of the hearing was no longer receiving payments. (Tr. 47). Two years before the hearing plaintiff moved from Pennsylvania to Illinois due to her husband changing jobs. (Tr. 48). She testified that since moving to Illinois, her husband got another new job about three hours away and only lived at home on weekends. She did not feel she could handle the stress of moving to where his job was located. (Tr. 64).  Plaintiff returned to Pennsylvania to see her family and receive treatment from one of her doctors every three or four months. (Tr. 48). Typically, her husband would drive them to Pennsylvania. (Tr. 56). She stated that if she had to fly the airport overwhelmed her and she would need several days rest after. (Tr. 57).

Plaintiff testified that she had a low tolerance for stress and began crying during the hearing. (Tr. 51-52). She stated that she slept a little less than half the day and had difficulty focusing on television. (Tr. 51). Her medications helped keep her out of the hospital but she still had good and bad days. (Tr. 53). The

previous year she was associating with new people and began drinking more. (Tr. 62). During this time she had a manic episode and received a DUI. (Tr. 61). Before this episode plaintiff had no issues with alcohol, but now only drank one glass of wine every four to six weeks. (Tr. 61). She testified that she volunteered at a nursing home a few hours a week where she helped serve lunch or hand out pills. (Tr. 61).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to perform light, unskilled work, and all postural activities occasionally. Additionally, they should have a stable work setting without frequent shifts in the expectations of the employer, no stringent speed or production requirements, and only occasional interactions with supervisors, coworkers, and the general public. (Tr. 66).

The VE testified that the person would be unable to perform plaintiff's previous work. However, she could do jobs that exist in significant numbers in the national economy. Examples of such jobs are sorter, inspector, and assembler. (Tr. 66-67). The VE testified that if the individual were to miss three or more workdays a month it would preclude employment. Additionally, if the ALJ found plaintiff's testimony credible and substantiated by medical evidence the VE testified that plaintiff would be unable to perform full time employment. (Tr. 68).

**3. Medical Treatment**

Since 1999 plaintiff regularly saw psychiatrist Martha Little for treatment of her psychological problems. (Tr. 617). In December 2008, plaintiff complained to Dr. Little about significant pressures she was facing at work. She was having panic attacks, taking more Xanax, and was unable to complete a full workweek. (Tr. 534-37). In January 2009 after deciding to resign from work, plaintiff reported feeling calmer but noted the thought of returning to work made her anxious. (Tr. 533). Thereafter, plaintiff continually reported post-traumatic stress disorder symptoms related to her previous work environment. Dr. Little reported plaintiff had panic attacks and flashbacks when thinking or talking about her job. (Tr. 527, 531).

Plaintiff often reported that her mood was up and down, she had anxiety attacks, and she had difficulty completing tasks. Dr. Little repeatedly changed plaintiff's medications to help with her symptoms. On every report she diagnosed plaintiff with bipolar affective disorder, PTSD, chronic anxiety, or adjustment disorder. (Tr. 517-551, 623-30, 644-49, 787-99, 893). Dr. Little's treatment notes indicate that plaintiff had manic episodes where she would stay up all night and was overly energetic, as well as depressive episodes where she could not leave her bed for the entire day. (Ex., Tr. 624-28, 646, 649, 787). When she had particularly bad episodes of depression her hygiene was poor and she was ill-kempt. (Tr. 624-26).

Plaintiff moved to Illinois in 2010 but continued to receive treatment from Dr. Little when possible. In August 2010, plaintiff indicated she was struggling

with life in Illinois and continued to have panic attacks. Dt. Little assigned plaintiff a GAF score of 35 and stated her heavy medication load made it difficult for plaintiff to concentrate. (Tr. 788). In November, Dr. Little's treatment notes indicate plaintiff attempted to work for a week but was unable to continue due to her anxiety attacks. The record shows that Dr. Little noted plaintiff needed to find some work, even if it was part-time. (Tr. 789).

In 2011, plaintiff began volunteering a few hours a week and seeing a new psychologist, Dr. Boyd, in Illinois. (Tr. 794, 817). Dr. Boyd regularly saw plaintiff and noted she had illogical thought and chronic anxiety. (TR. 762-3, 803, 805-6, 810-125, 815, 890). He discouraged full time employment and tried to teach plaintiff appropriate coping skills. (Tr. 764, 802). In November and December 2011, plaintiff had a breakdown and called Dr. Boyd on an emergency basis. He recommended she go to the hospital due to her suicidal ideations but she refused. (Tr. 808-11). During this time plaintiff got a DUI and Dr. Boyd did not want her to be left alone. (Tr. 809). Dr. Boyd's treatment notes indicated that while plaintiff still volunteered a few hours a week and completed her court ordered DUI classes, her bipolar disorder was still problematic. (Tr. 890-92).

### 4. Opinions of Treating Physicians

Dr. Little submitted several reports about plaintiff's functional capacity. She submitted her first report in February 2010. She stated plaintiff had bipolar syndrome with a history of episodic periods manifested by both manic and depressive syndromes. Plaintiff reported anhedonia, sleep disturbance, decreased

energy, appetite disturbance, and psychomotor agitation or retardation. Dr. Little described her mood as variable form panic to depression. She stated plaintiff had poor concentration and her speech was mildly pressured. (Tr. 617). Dr. Little felt plaintiff was moderately limited in her ability to perform activities of daily living and maintain social functioning. She opined that plaintiff was markedly limited in her concentration, persistence, and pace and that plaintiff would have repeated episodes of deterioration at work. Dr. Little stated she felt plaintiff was unable to work. (Tr. 618).

Dr. Little's second opinion was written in August 2011. (Tr. 785-86). Plaintiff's diagnoses were bipolar affective disorder drug resistant with extreme anxiety and post-traumatic stress disorder which prevents plaintiff from working. She stated plaintiff had marked limitations in her activities of daily living and social functioning. Dr. Little felt plaintiff had marked limitations in her concentration, persistence, and pace. (Tr. 785).  She stated plaintiff had four or more episodes of decompensation in the last year and she would anticipate plaintiff missing work more than three times a month. (Tr. 786).

Dr. Little's final opinion was in the form of a letter to the Department of Human Services in October 2011. (Tr. 783-84). She stated plaintiff suffered from bipolar affective disorder, anxiety disorder, and post-traumatic stress disorder. Plaintiff fluctuated from depression to mania to mixed states and was a rapid cycler. Dr. Little stated that because of plaintiff's mental health issues she was prevented from attending work on a regular basis and performing the work she

was qualified to do. She stated plaintiff had difficulty with sleep and regularly took Xanax which caused fatigue. Dr. Little opined that if plaintiff were able to work again in the future she could only handle a part time job and not in a stressful field. She assigned plaintiff a GAF score of 35. (Tr. 784).

Dr. Boyd also provided three opinions with regards to plaintiff's mental functional capacity. His first opinion was written in July 2011 and he had last seen plaintiff one month prior. He diagnosed her with bipolar disorder and generalized anxiety. He felt plaintiff only had a mild restriction with regards to activities of daily living. However, he also felt plaintiff had extreme limitations in social functioning and concentration, persistence, and pace. (Tr. 760). He stated plaintiff had three episodes of decompensation in the last year and that she would probably miss work more than three times a month. (Tr. 761). Based on plaintiff's record he did not believe she would be able to function in a customary work setting on a consistent basis and meet minimal work demands. He stated she may someday be a candidate for vocational rehabilitation but he felt it was more than a year away. (Tr. 759).

Dr. Boyd's submitted a progress report in March 2012. (Tr. 800-01). Dr. Boyd reported that since his prior opinion plaintiff had a substantial manic episode with decompensation and regression in her behavior. She called Dr. Boyd on an emergency basis during this time period. While she had improved somewhat since the episode, she still was significantly depressed, chronically anxious, and prone to anxiety attacks. He stated plaintiff had substantial

regression and would not be able to function in any employment capacity. (Tr. 800). Dr. Boyd noted that while plaintiff may have periods of improvement, the nature of her bipolar disorder was that she would always have periods of exacerbation. (Tr. 801).

Finally, Dr. Boyd completed a psychological evaluation in July 2012. (Tr. 853-61). Plaintiff was alert and correctly oriented times four but she began uncontrollably crying at one point. Her attention, concentration, and short term memory showed mild impairment. (Tr. 855). Plaintiff had rapid speech and her mood was depressive with agitated features. (Tr. 856). He diagnosed plaintiff with bipolar disorder rapid cycling type, generalized anxiety disorder with panic attacks, and episodic alcohol abuse. He stated plaintiff did not have adequate coping skills and would not be reliable in a work setting as she would be overwhelmed by work pressures. Dr. Boyd assigned plaintiff a GAF score of 48. (Tr. 857).

### 5. Consultative Examinations

In October 2009 plaintiff had a mental consultative examination with Herbert Machowsky, Ed.D. (Tr. 575-80). Dr. Machowsky felt plaintiff had a slight impairment in her ability to carry out short and simple instructions and her ability to understand and remember detailed instructions. He opined that plaintiff had moderate impairment in her ability to make judgments on simple work related decisions, interact appropriately with supervisors and coworkers, respond appropriately to work pressures in a work setting, and respond appropriately to

changes in a routine work setting. (Tr. 575). Plaintiff's mood was dysthymic, anxious, ruminative with mild agitation and tearfulness. (Tr. 578). Dr. Machowsky diagnosed plaintiff with bipolar disorder, currently depressed and anxiety disorder NOS. He felt her prognosis was fair as she was adherent to her medications and counseling. He also stated plaintiff handling her own benefits would be contraindicated. (Tr. 580).

In July 2012 plaintiff had a physical consultative examination with Dr. Vittal Chapa. (Tr. 866-75). He felt plaintiff could occasionally lift and carry up to fifty pounds. (Tr. 866). Dr. Chapa stated plaintiff could sit for eight hours, stand for five hours, and walk for three hours out of an eight hour work day. (Tr. 867). His diagnostic impressions were chronic cervical pain syndrome, migraine headaches, a history of cardiac arrhythmia, and irritable bowel syndrome. (Tr. 875).

### 6. RFC Assessments

Plaintiff's first mental RFC assessment was performed by Dr. Francis Murphy in November 2009. (Tr. 597-99). Based on plaintiff's records at the time, he felt plaintiff was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions form psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to changes in the work setting. (Tr. 597-98).  He opined

that plaintiff could perform simple, routine, repetitive work in a stable environment and could be expected to complete a normal workweek without exacerbation of psychological symptoms. Additionally, she had the ability to perform repetitive work without constant supervision and had no restrictions in regards to social interaction.

Plaintiff's second mental RFC assessment was performed by Dr. Joseph Mehr in July 2011. (Tr. 779-81). He opined that plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions, sustain an ordinary routine without special supervision, interact appropriately with the general public, and respond appropriately to changes in the work setting. He felt she was markedly limited in her ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 779-80).

While he felt plaintiff had the intellectual ability to understand and remember instructions for simple tasks, she did not have the necessary attention and concentration to persist and complete those operations. Plaintiff did not have the capacity to maintain a schedule and be on time, and did not retain the pace and endurance necessary to fulfill a normal workday on a consistent basis. He

opined that plaintiff did not have the capacity to persevere at or sustain work. (Tr. 781).

## Analysis

Plaintiff argues that the ALJ improperly weighed the medical opinions, erred in her credibility determination, and failed to ask appropriate hypothetical questions to the VE.

The Court first looks at plaintiff's argument that the ALJ improperly weighed the medical opinions. Plaintiff first contends that the ALJ did not provide an adequate analysis of the opinions of Dr. Boyd when assigning them "some weight." (Tr. 27). The ALJ is required to consider a number of factors in weighing a treating doctor's opinion.  The applicable regulation refers to a treating healthcare provider as a "treating source." The version of 20 C.F.R. §404.1527(c)(2) in effect at the time of the ALJ's decision states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. [Emphasis added]

A treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. *Clifford v. Apfel*, **227 F.3d 863 (7th Cir. 2000)**;

*Zurawski*, **245 F.3d at 881.** Supportability and consistency are two important factors to be considered in weighing medical opinions.   In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue,* **602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).**

The ALJ looked at Dr. Boyd's opinions and determined they were not consistent with his treatment notes. (Tr. 27). While the ALJ is only required to minimally articulate his reasons for rejecting evidence, his reasoning has to be sound. *Berger v. Astrue*, **516 F.3d 539, 545 (7th Cir. 2008);** *Jelinek v. Astrue*, **662 F.3d 805, 811 (7th Cir. 2011).** Here, the Court agrees with plaintiff that ALJ Pritchett's analysis is insufficient.

First, the ALJ focuses on what she considers moderate rather than severe limitations in Dr. Boyd's treatment notes. The ALJ states that plaintiff had mostly normal sessions with some ups and downs and focuses on a report that she could follow moderately complex instructions. She also notes that plaintiff had a fair insight as opposed to an impaired insight, and her mood, appearance, relatedness, speech, and affect were normal.  (Tr. 26-7).

The ALJ focused on minimal portions of Dr. Boyd's records where plaintiff was doing well and indicated they were representative of the record as a whole. The treatment notes indicate the opposite. Dr. Boyd's notes show plaintiff

regularly had illogical thoughts, chronic anxiety, mood swings, difficulty completing everyday tasks, and impaired judgment. (Ex., Tr. 762-4, 800-04, 810, 812, 890-92). When plaintiff was doing well, it was always followed by her symptoms getting worse once again. For instance, plaintiff was relatively stable in early November 2011. However, by the end of the month she required emergency treatment from Dr. Boyd. (Tr. 806-10). In May 2012 Dr. Boyd's notes indicate plaintiff was "ok" but by June she was "horrible." (Tr. 890-92). In weighing the medical opinions, the ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with her conclusion. *Myles v. Astrue*, **582 F.3d 672, 678 (7th Cir. 2009).** While an ALJ is not required to mention every piece of evidence, "he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." *Godbey v. Apfel*, **238 F.3d 803, 808 (7th Cir. 2000).**

Additionally, plaintiff suffers from bipolar disorder where, as the Seventh Circuit has observed, symptoms often wax and wane. "[A] snapshot of any single moment says little about her overall condition." *Punzio v. Astrue*, **630 F.3d 704, 710 (7th Cir. 2011).** ALJ Pritchett downplays plaintiff's disorder by noting that plaintiff had "some ups and downs" and focused on snapshots where plaintiff was doing well. The overall record indicates plaintiff's bipolar disorder regularly affected her ability to function normally and the ALJ's failure to recognize this is error.

The ALJ also looked at plaintiff's daily activities such as volunteering a few

hours a week, attending DUI classes, and being actively engaged in her treatment regimen. The ALJ stated that these activities indicated plaintiff was capable of performing some work. The Seventh Circuit has repeatedly held it is appropriate to consider these activities but it should be done with caution. The ability to perform daily tasks "does not necessarily translate into an ability to work full-time." *Roddy v. Astrue***, 705 F.3d 631, 639 (7th Cir. 2013).** Plaintiff's daily activities can all be done with significant limitations and do not indicate she can complete an entire workday or workweek. She only volunteers a few hours a week when she feels well. On plaintiff's bad days she rarely leaves her bed and may not make meals for herself. (Tr. 302, 391, 649, 787, 796, 800). Again, the ALJ impermissibly cherry-picked the evidence in order to support her opinion that plaintiff can perform work. *Myles,* **582 F.3d 678.**

Additionally, the ALJ failed to explain how plaintiff's daily activities translated into her working capabilities. She simply stated that plaintiff volunteered and participated in court ordered activities. The Seventh Circuit has held the ALJ must do more than merely mention daily activities to build a logical bridge to her conclusions in these instances. See *Hamilton v. Colvin*. **525 Fed. Appx. 433, 438 (7th Cir. 2013)** ALJ Pritchett simply failed to do so here. As a result, her decision is lacking in evidentiary support and must be remanded. *Minnick v. Colvin,* **__ F.3d __, 2015 WL 75273, \*7 (7th Cir. 2015);** *Kastner v. Astrue***, 697 F.3d 642, 646 (7th Cir. 2012).**

The Court wishes to stress that this Memorandum and Order should not be

construed as an indication that the Court believes that plaintiff is disabled or that he should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Alissa H. Del Real's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**


**DATE:  February 18, 2015.**


**<u>s/ Clifford J. Proud</u>**

**CLIFFORD J. PROUD**

**UNITED STATES MAGISTRATE JUDGE**